**MID–SOUTH PACKERS, INC.,**
**Plaintiff-Appellee,**

v.

**SHONEY'S, INC., Defendant-Appellant.**

**No. 84–4797**
**Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

June 3, 1985.

Tabue Sturdivant & DeWitt, Gary M. Brown, Nashville, Tenn., for defendant-appellant.

Wildman, Harrold, Allen, Dixon & McDonnell, Jerome Turner, Memphis, Tenn., for plaintiff-appellee.

Before WILLIAMS, JOLLY, and HILL, Circuit Judges.

PER CURIAM:

This diversity action on a Mississippi contract is before us following the district court's entry of summary judgment in favor of plaintiff Mid-South Packers, Inc., (Mid-South) and against defendant Shoney's, Inc., (Shoney's). We affirm.

I.

The facts, as viewed in the light most favorable to Shoney's,[1] are as follows. In the spring of 1982, Mid-South and Shoney's engaged in negotiations for the sale by Mid-South to Shoney's of various pork products including bacon and ham. A business meeting was held between representatives of the two companies on April 17, 1982, at the offices of Mid-South in Tupelo, Mississippi. The discussion concerned prices and terms at which Mid-South could supply bacon and ham to Shoney's. At this meeting, Mid-South submitted a letter styled "Proposal" that set forth prices and terms at which Mid-South would supply Shoney's with various types of meat. The letter also provided that Shoney's would be informed forty-five days prior to any adjustment in price. The letter contained neither quantity nor durational terms. Shoney's expressed neither assent to nor rejection of the prices outlined in the letter. Shoney's estimated its needs from Mid-South at 80,000 pounds of meat per week. The legal effect of the letter proposal is the center of the controversy.

In July 1982, Shoney's began purchasing goods from Mid-South. The transactions were initiated by Shoney's, either through purchase orders or through telephone calls. On the day following each shipment, Mid-South sent invoices to Shoney's containing additional provisions for payment of both fifteen percent per annum interest on accounts not paid within seven days and reasonable collection costs, including attorney's fees. Shoney's bought vast quantities of bacon from Mid-South until August 12, 1982. On that date, Mid-South informed Shoney's at a meeting of their representatives that the price for future orders of bacon would be raised by $0.10 per pound, due to a previous error in computation by Mid-South. Shoney's objected to the price modification, apparently in reliance on the forty-five day notice provision contained in the disputed letter proposal. After negotiations, Mid-South agreed to increase the price by only $0.07 per pound. Shoney's neither agreed nor refused to purchase at the new price. Mid-South's new proposal was never reduced to writing.

On the first Shoney's purchase order sent after the August 12 meeting, Shoney's requested shipment at the old lower price. When Mid-South received the purchase order its representative, Morris Ates, called Shoney's representative, Ray Harmon, and advised Harmon that Mid-South would only deliver at the new higher price. The uncontradicted testimony of Ates is that Harmon told Ates to ship the bacon and to note

1. *See, e.g., Simmons v. Lyons,* 746 F.2d 265, 267 (5th Cir.1984).

the higher price on Shoney's purchase order. The bacon was shipped, and an invoice at the new price followed as did Shoney's payment, also at the new price.

From August 18 until October 5, 1982, Shoney's placed numerous orders for goods, including bacon, with Mid-South. Some if not all of these orders involved telephone conversations between representatives of the two companies, at which time Mid-South again quoted its increased selling price. The telephone conversations were followed by written purchase orders from Shoney's which quoted both the new price from Mid-South and a price computed at the original amount of $0.07 less per pound. In all cases, the orders were filled by Mid-South and invoiced at the new price. These invoices also included the additional terms providing for interest on delinquent accounts and reasonable collection costs. Shoney's paid Mid-South's quoted prices in all instances except the final order. On the final order before Shoney's began purchasing from another supplier, Shoney's offset the amount due on the invoice by $26,208, the amount allegedly overcharged on prior orders as a result of the $0.07 price increase.

Mid-South then brought this action to recover the amount offset plus interest and reasonable collection costs, including attorney's fees, as provided in the invoices. Shoney's admits that it owes $8,064.00 of the offset to Mid-South, inasmuch as this amount is attributable to orders placed after the expiration of the forty-five day notice period which, Shoney's contends, commenced on August 12 when Mid-South asked for the price increase.

## II.

Shoney's contends that it accepted the proposal of Mid-South to supply it meat by placing orders with Mid-South, thereby forming a binding contract between the parties. Shoney's characterizes the contract as a "requirements contract" and asserts that the quantity term under the contract was that amount it reasonably and in good faith required. Accordingly, Shoney's argues that the notice provision contained in the letter proposal contractually bound Mid-South to notify Shoney's forty-five days before increasing its prices.

Mid-South asserts that the proposal was at most a "firm offer." Mid-South argues that under Miss.Code Ann. § 75-2-205 (1972), Uniform Commercial Code § 2-205, (hereinafter referred to as U.C.C. or the Code), a firm offer is irrevocable despite a lack of consideration "during the time stated or if no time is stated for a reasonable time; but in no event may such period of irrevocability exceed three (3) months." Thus, Mid-South contends that under any construction of the document, the offer must have expired three months after April 17, 1982, the date of the letter proposal, or on approximately July 17, 1982; therefore, it asserts the right on August 12, 1982, to increase the selling price without notice.

The district court, on consideration of cross summary judgment motions, adopted Mid-South's theory, holding that no long-term requirements contract was created and that each purchase order constituted a separate contract for the amount stated at the price required by Mid-South.

 Requirements contracts are recognized in Mississippi and are not void for indefiniteness. Miss.Code Ann. § 75-2-306(1). However, an essential element of a requirements contract is the promise of the buyer to purchase exclusively from the seller either the buyer's entire requirements or up to a specified amount. *Willard, Sutherland & Co. v. United States*, 262 U.S. 489, 493, 43 S.Ct. 592, 594, 67 L.Ed. 1086, 1088 (1923) (common law); *Laclede Gas Co. v. Amoco Oil Co.*, 522 F.2d 33, 37-38 (8th Cir.1975) (Missouri law, U.C.C.); *Mason v. United States*, 615 F.2d 1343, 1346, 222 Ct.Cl. 436 (1980) (common law); *Propane Industrial, Inc. v. General Motors Corp.*, 429 F.Supp. 214, 219 n. 5 (W.D.Mo. 1977) (Kansas law, U.C.C.); *Hutchinson Gas & Fuel Co. v. Wichita Natural Gas Co.*, 267 Fed. 35, 39, 42 (8th Cir.1920) (Kansas common law); 1 S. Williston, Contracts § 104A, at 406-07 (3d ed. 1957); 1A A. Corbin, Contracts § 157, at 48-49 (2d ed.

1963 & Supp.1971); Restatement (Second) of Contracts § 77 comment d, illustration 8 (1981). Absent such a commitment, the requirements contract fails for want of consideration. *Willard, Sutherland & Co.*, 262 U.S. at 493, 43 S.Ct. at 594; *Laclede Gas Co.*, 522 F.2d at 37; *Propane Industrial*, 429 F.Supp. at 219; 1 S. Williston, Contracts § 105A, at 423; 1A A. Corbin, Contracts § 152 at 8–10, § 157 at 40–41; Restatement (Second) of Contracts §§ 71, 79 comment F.

■ Ray Harmon, Shoney's agent in the transaction, maintained that Shoney's at all times had the right to purchase goods from suppliers other than Mid-South, that Shoney's continued to purchase from Mid-South because it was satisfied with its service and the quality of its goods, and that the purchase orders sent by Shoney's to Mid-South beginning in July 1982 "would have been the only commitment (Shoney's) would have made." Mid-South agrees that Shoney's had the right to change suppliers. Thus, by Shoney's own admission, no requirements contract could have arisen from the April 17 letter proposal and the meeting at which it was discussed.

■ Under the Code, the letter proposal and surrounding negotiations constituted, at most, a "firm offer" which was irrevocable, without consideration, only for a period of three months commencing on April 17 and ending on July 17, 1982. Miss.Code Ann. § 75–2–205.[2] Thus, Mid-South had the right, after July 17, to raise its offered price as it did and the district court was correct in so holding.

■ The district court was also correct in holding that each purchase order stood on its own as a contract between Shoney's and Mid-South. More specifically, Mid-South's letter proposal was its offer in the sense that it was a promise to sell at the listed prices, justifying Shoney's in understanding that its assent, *i.e.*, its purchase orders or telephone calls, would close the bargain. *Boese-Hilburn Co. v. Dean Machinery Co.*, 616 S.W.2d 520 (Mo.App. 1981); *Propane Industrial, Inc.*, 429 F.Supp. at 219; 1 A. Corbin, Contracts § 11 at 25 (1963); 1 S. Williston, Contracts § 24A (3d ed. 1957); Restatement (Second) of Contracts § 24 (1981) (offer as promise). Thus, each time Shoney's manifested its assent, in telephone calls or purchase orders to Mid-South, a new and independent contract between the parties was created. *See Coastal Chemical Corporation v. Filtrol Corporation*, 374 F.2d 108, 109 (5th Cir.1967) (Mississippi law); 1A A. Corbin, Contracts § 157 at 40–46 (where the theory here espoused is discussed at length).

Mid-South's offer, held open in its discretion at least after July 17, was properly revoked and replaced by the offer of a seven-cent price increase at the August 12 meeting. *Cf.* 1A A. Corbin § 157 at 46. Shoney's accepted this new offer for the first time on August 18 when Harmon, having been informed by Ates that Mid-South would not sell except at the new price, ordered shipment. Thereafter, Shoney's created separate contracts and obligated itself to pay the new price each time it mailed purchase orders with that price noted on them.[3] Shoney's practice of also noting the old price on the purchase orders had no contractual significance since Harmon admitted that the practice was "a tracking procedure" used by Shoney's internally in order to determine the difference between the old price and the new. Ates' testimony is uncontradicted that Harmon also told him this.

■ In addition, Harmon admitted that Shoney's ordered at and paid the new price

---

**2.** Section 75–2–205 provides, in part:
An offer by a merchant to buy or sell goods in a signed writing which by its terms gives assurance that it will be held open is not revocable, for lack of consideration, during the time stated or if no time is stated for a reasonable time, but in no event may such period of irrevocability exceed three (3) months.

**3.** The purchase orders also contained a column entitled "amount" which showed the total purchase price arrived at by multiplying the per unit price by the quantity ordered. On most of the post-August 12 purchase orders, Shoney's used the new higher price in computing the amount total.

with the intention of causing Mid-South to believe that Shoney's had accepted the new price so that the shipments would continue; and Mid-South attached precisely that significance to Shoney's conduct. Shoney's secretly harbored intent to later deduct the difference between the old and new price could not bind Mid-South. *See, e.g., Hotchkiss v. National City Bank,* 200 Fed. 287, 293 (S.D.N.Y.1911) (Hand, J.), *aff'd* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913) (only manifested assent is binding); Restatement (Second) of Contracts §§ 20(2)(a), 201(2)(a) (1981) (same). Conduct may bind a party to a contract if it "show[s] agreement." Miss.Code Ann. § 75–2–204(1); § 75–2–207(3). "Agreement" of the parties must be manifested either in language or conduct in the circumstances. Miss.Code Ann. § 75–1–201(3). The only manifestations Shoney's made were those consistent with assent to Mid-South's new offer. Finally, the parties' "course of performance" is consistent only with Mid-South's expressed offer and Shoney's expressed acceptance of the new price. Miss.Code Ann. § 75–1–205(3)–(4); *Cf.* Miss.Code Ann. § 75–2–202(a).

■■■ Shoney's remedy under the circumstances was either to reserve whatever right it might have had to the old price by sending its purchase orders with an "explicit reservation," Miss.Code Ann. § 75–1–207, or to find a supplier who would sell at an acceptable price. No rational theory of the law of contracts could permit Shoney's to manifest acceptance of Mid-South's new offer, thus inducing performance, and then revoke that acceptance and demand compliance with the terms of the prior, withdrawn offer. *See* Miss.Code Ann. § 75–2–606(1)(b); § 75–2–607(1). Hence, the entire $26,208 offset by Shoney's is due and owing Mid-South and the district court's judgment, to this extent, was proper.

### III.

The parties also dispute the legal effect of the interest and attorney's fees provision contained in Mid-South's invoices. These terms provide for the payment of both interest of fifteen percent per annum on delinquent accounts as well as the reasonable costs of collection, including attorney's fees. Shoney's contends that these proposed additional terms, contained only in Mid-South's invoices sent one day after shipment of the goods, never became part of the contracts created when Shoney's expressed acceptance in the purchase orders.[4] The district court, relying on Miss.Code Ann. § 75–2–207(1)–(2), held that the terms were part of the contract and that, therefore, Mid-South was entitled to recover interest and collection costs on the amounts due and unpaid by Shoney's from the final invoice. We agree.

Miss.Code Ann. § 75–2–207(1)–(2) provides:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

The Mid-South invoices were not "expression[s] of acceptance." The first issue is therefore whether they constituted "written confirmation[s]". We think this the most reasonable construction of their effect.

---

**4.** Shoney's does not dispute Mid-South's entitlement to prejudgment interest on any damages awarded. *See* Miss.Code Ann. § 75–17–1.

Section 75-2-207 applies to the situation in which an agreement has been previously reached either orally or by informal writings, and one or both parties send written confirmation of terms discussed, adding certain terms not discussed. *See Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1165 (6th Cir.1972) (Tennessee law, U.C.C.); *Reaction Molding Technologies v. General Electric Co.*, 585 F.Supp. 1097, 1104-05 (E.D.Pa.1984) (Pennsylvania law, U.C.C.); *Trust Co. Bank v. Barrett Distributors, Inc.*, 459 F.Supp. 959, 961 (S.D.Ind.1978) (Indiana law, U.C.C.); U.C.C. § 2-207, Official Comment 1. The written confirmation is recognized primarily as a writing necessary to satisfy the statute of frauds when the agreement reached is at least partially unenforceable for lack of a writing; this appears to be the primary basis for permitting a written confirmation to act as an acceptance under § 75-2-207(1). *Reaction Molding*, 585 F.Supp. at 1104-05; 1 A. Squillante & J. Fonesca, Williston on Sales § 7-5 at 284-87 (hereinafter, Williston on Sales) (where contract is within statute of frauds, §§ 2-201(2) and 2-207(1) are to be read together in determining whether writing is "confirmation"). We think this rationale properly applies to contracts that are partially oral, *i.e.*, the offer is oral and the acceptance written, so long as the written acceptance does not purport to contain the entire agreement. *See Dorton*, 453 F.2d at 1167 n. 2.

Here, Mid-South's August 12 offer to sell was orally made. Thus, the contract, concluded by Shoney's purchase orders, was initially unenforceable against Mid-South because not evidenced by a writing signed by Mid-South. Miss.Code Ann. § 75-2-201(1).[5] Mid-South's invoice rendered the contract enforceable against it

under the statute of frauds. *Id.* By the same token, the extensive course of dealing between the two parties clearly indicated to Shoney's that the invoices would follow its purchase orders and, Shoney's having received several of the invoices in prior transactions, the interest and collection costs terms came as no surprise to Shoney's. *See* Miss.Code Ann § 75-2-208(2); 1 Williston on Sales § 7-5 at 287; 1 R. Anderson, Uniform Commercial Code § 2-207:7 (1970). Moreover, Shoney's purchase orders did not purport to contain all of the terms of the agreement and Mid-South's invoice, sent only one day following shipment, added a certainty and definiteness to the contract's terms that both parties expected and, presumably, desired. Finally, Shoney's had the right and the opportunity to prevent, in the usual way, the proposed terms from becoming part of the contract. *See* Miss.Code Ann. § 75-2-207(2)(b)-(c). Our holding in no way limits that right for future offerees.

To be sure, courts have expressed some doubt, in contexts different from that presented here, whether a writing sent subsequent to the closing of the bargain may operate as an acceptance under § 2-207(1).[6] However, under the circumstances of this transaction, and for the reasons stated, we think Mid-South's invoices constituted "written confirmations" within that section. *See Reaction Molding*, 585 F.Supp. at 1104-05.

Whether the form in question is an acceptance or a confirmation, the analysis under § 2-207(2) proceeds in the same manner. *Dorton*, 453 F.2d at 1169-70. Hence, because Shoney's does not contend that any of the exceptions of § 75-2-207(2) ap-

---

**5.** Of course, the contract later became enforceable to the extent of performance. Miss.Code Ann. § 75-2-201(3)(a).

**6.** *See Cosden Oil & Chem. Co. v. Karl O. Helm Ag.*, 38 U.C.C.Rep.Ser. 1645 (5th Cir.1984) (monthly statement not written confirmation of contract concluded by seller's execution of purchase confirmation supplied by buyer); *Wheaton Glass Co. v. Pharmex Inc.*, 548 F.Supp. 1242, 1244 (D.N.J.1982) (seller's invoice sent after ac-

ceptance by conduct of seller and § 2-207(3), not "part of contract"; § 2-207(1) not in issue); *Trust Co. Bank v. Barrett Distribution, Inc.*, 459 F.Supp. 959, 961 (S.D.Ind.1978) (dictum: "There is a question whether an invoice is a 'written confirmation.'"); *Preston Farm & Ranch Supply v. Bio-Zyme Enterprises*, 625 S.W.2d 295, 299-300 (Tex.1981) (end-of-month statement not "written confirmation").

**1124**

ply, the terms added by the invoice became "part of the contract" and Shoney's is obligated to pay interest and reasonable collection costs, including attorney's fees, as provided in the invoices, plus prejudgment interest as decreed by the district court.

AFFIRMED.