**In re EMPIRE PACIFIC INDUSTRIES, INC., Debtor.**

**John G. WIENCKEN, Trustee, Plaintiff,**

**v.**

**MILL–RITE SASH & DOOR CO., INC., a Colorado corporation, Defendant.**

Bankruptcy No. 382–03577–P11.
Adv. No. 86-0007–P.

United States Bankruptcy Court,
D. Oregon.

March 13, 1987.

John W. Weil, of Ransom, Blackman & Simson, Portland, Or., for plaintiff.

Joann B. Reynolds, of Bennett, Hartman & Reynolds, Portland, Or., for defendant.

## MEMORANDUM OPINION

ELIZABETH L. PERRIS, Bankruptcy Judge.

The Plaintiff, Trustee for the estate of Empire Pacific Industries, Inc. ("EPI"), filed this adversary proceeding to collect an outstanding balance of $18,227.95 owed to EPI by the Defendant, Mill-Rite Sash & Door Co., Inc. ("Mill-Rite"). Mill-Rite counterclaimed for $25,936.09 on the basis of alleged defects in certain doors supplied by EPI, and on the basis that the doors deliv-

ered did not conform to the terms of the contract between the parties.[1]

The Defendant concedes that the invoices relied upon by the Plaintiff accurately reflect shipments of doors it received from EPI. Although Defendant contests the validity of certain charges, alleging that EPI did not allow promised discounts on certain shipments, most of the evidence presented at trial went to proof of the counterclaims.

### FACTUAL BACKGROUND

Mill-Rite is in the business of supplying doors for construction projects. From September 1985 through June 1985, Mill-Rite ordered approximately $80,000–$90,000 worth of doors from EPI through Mr. Dick Gheen, EPI's manufacturer representative in Denver, Colorado. The parties conducted their business on the basis of oral agreements, usually followed by a written purchase order from Mill-Rite. Mr. Gheen would call the order into EPI, and EPI would transfer the information onto a production order form. A copy of the production order was then sent to Mill-Rite as a customer acknowledgment. None of these documents contained information as to the terms of the agreement, except quantity, price and specifications. EPI shipped the goods, accompanied by an invoice, to the place specified in the purchase order.

The invoice contains on its front the information found in the customer acknowledgment, and information concerning discounts for prompt payment. On the reverse side, is printed a "Customer Policy Statement". That statement contains several terms including a late charge for balances over 30 days old, an attorney's fees provision, a disclaimer of warranties, an express limited warranty of repair or replacement, and a limitation of remedy disclaiming liability for incidental and consequential damages. There is nothing noted on the front of the invoice to direct one's attention to the terms on the reverse side.

In December 1984 and January 1985, Mill-Rite ordered the doors that are the subject of this lawsuit. The doors were intended for three projects, one in Salt Lake City, Utah, the Intermark job, and two in Denver, Colorado, the Albarici and Galbraith jobs.

### INTERMARK PROJECT

The Defendant seeks damages arising from three problems concerning the Intermark doors. It contends that the bi-fold doors provided were defective in that the rails split from skins of the doors when a sleeving for a pin was inserted into the doors. EPI acknowleged that the doors were defective by paying for the return of the doors and issuing a credit for the price of the doors. The Defendant now seeks payment for costs it incurred in gathering up the defective doors in order to send them back to EPI. EPI resists Defendant's request on the grounds that under the terms stated on the back of the invoice, it is not liable for incidental damages. It argues that it complied fully with the terms of its limited warranty by taking the doors back and by crediting Mill-Rite's account for the price of the doors. The preliminary issue raised by this counterclaim is whether the terms found on the reverse side of the invoice are part of the contract between the parties.

The Defendant cites ORS 72.2070(2), and argues that the waiver of implied warranties and the limitation of remedies found on the invoice are not part of the contract because they materially alter the terms of the oral agreement. ORS 72.2070(2) provides that additional terms found in a written confirmation do not become part of a contract between merchants if they materially alter the terms of the existing agreement. The Court agrees that the terms found on the reverse side of the invoice are not a part of the contract between the parties, but for sightly different reasons than those urged by the Defendant.

Oregon Revised Statute 72.2070(1) states:

---

**1.** This is a non-core proceeding according to the provisions of 28 U.S.C. § 157(b)(2). The parties have consented to entry of final judgment by this Court. 28 U.S.C. § 157(c)(2) (West.Supp. 1985).

"A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even through it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms."

Subsection (2) goes on to state that such terms are to construed as proposals for addition to the contract. Between merchants they become part of the contract unless the offer expressly limits acceptance to the terms of the offer, they materially alter the contract, or the other party objects.

■ Several courts have acknowledged that it is unclear whether Uniform Commercial Code § 2–207, (the uniform counterpart of ORS 72.2070), applies in cases where the additional terms appear in an invoice received with or sent after the good are shipped. *See Mid-South Packers, Inc. v. Shoney's, Inc.*, 761 F.2d 1117, 1123 n. 6 (5th Cir.1985); *Resch v. Greenlee Bros. & Co.*, 128 Wis.2d 237, 381 N.W.2d 590, 42 UCC Rep. 820 (Ct.App.1985); and *Trust Co. Bank v. Barrett Dist. Inc.*, 459 F.Supp. 959 (S.D.Ind.1978). For the reasons discussed below, it is this Court's opinion that the invoices sent by EPI to Mill-Rite are not written confirmations within the meaning of ORS 72.2070. Thus, the terms on the invoices are not a part of the contract even if they do not fall into one of the exceptions listed in ORS 72.2070(2).

ORS 72.2070 speaks of a "written confirmation which is sent within a reasonable time." ORS 71.2040(2) states that "what is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action." In this instance, even if the invoice is considered a "written confirmation", EPI did not send it within a reasonable time after the parties made the contract. EPI did send a written confirmation to Mill-Rite in the form of a copy of its production order. This was the reasonable time to include proposals for additional terms to the oral contract. Sending such a proposal with the goods or after the goods

were sent, as they were in this case, is not within a reasonable time of the making of the oral agreement. At the time the invoice was sent, the Plaintiff had completely performed its obligations under the contract by sending the goods. To allow the seller to make proposals for additions to a contract it has already completely performed would work an injustice on the buyer, who in this case had accepted the goods on the basis of the terms agreed to orally. While the Uniform Commercial Code places upon buyers an obligation to inspect goods prior to accepting them, and will deem that they have been accepted if objection is not timely made, ORS 72.6060, it nowhere places an obligation upon the buyer to inspect the invoice which accompanies the goods at the risk of being deemed to accept any terms on the invoice to which it does not object. Thus, the terms on the reverse side of the invoices are not part of the contracts between these two parties. The contracts contain the terms which were agreed to orally, plus whatever provisions of the UCC that are necessary to fill any gaps in the agreement.

The damages sought by the Defendant because of the defective doors sent to Intermark are: $830 for the removal and gathering of the doors, and $500 for Mr. Bicker's, Mill-Rite's president, trip to the Intermark job. The Court will grant full recovery for the removal and gathering of the doors as a proper incidental damage. ORS 72.7150. It will allow recovery of only $145 for the trip because this is the only amount which is supported by evidence of an expenditure.

The second problem to surface at the Intermark job involved an alleged overshipment of doors. Mill-Rite claims it was sent 128 doors more than it ordered from EPI. EPI claims that it sent the amount of doors ordered by Mill-Rite, and that Mill-Rite should pay for these doors regardless of whether it used them.

The evidence shows that on December 13, 1984, Mr. Bicker placed an order with Mr. Gheen for a large number of doors. Mr. Bicker testified that he realized that same day that he had over-ordered, so he

called Mr. Gheen back and asked him to reduce the order by 128 doors. Mr. Bicker recalls Mr. Gheen agreeing to reduce the order. Mr. Gheen does not remember one way or the other whether he received the second call from Mr. Bicker reducing the order. Mr. Bicker supports his position with a notation on his copy of a purchase order showing a reduction of the order. The reduced order was not received by EPI, who processed the original order. EPI did send a copy of the production order which showed the full order without the reduction, but Mill-Rite either ignored the confirmation or did not notice the variance. Mill-Rite informed EPI of the overshipment within a reasonable time after the doors arrived at the job site, and received instructions from EPI to retain the doors in case they could be used on the job. EPI chose not to have the doors shipped back with the bi-folds, as the extra doors were custom made and could not be easily resold.

■ The Court finds that an oral contract was made for the full amount of the doors, but that contract was modified by a subsequent agreement to reduce the order by 128 doors.[2] The oral modification rendered the shipment of the extra 128 doors to be outside the terms of the modified contract.[3] When Mill-Rite notified EPI of the arrival of 128 doors more than ordered, it effectively rejected the non-conforming tender. ORS 72.6020(1). After rejection, Mill-Rite had a duty, under ORS 72.6030, to follow any reasonable instruction received from the seller. EPI instructed Mill-Rite to hold on to the doors, and it did so. Mill-Rite did not breach this duty by storing the

doors outside because it told EPI that it would do so. Whatever damage resulted from the storage of the doors outside must be borne by EPI because the risk of loss remains on the seller if goods are rightfully rejected. ORS 72.5100(1).

EPI argues that Mill-Rite should bear the loss resulting from the overshipment because it had a chance to avoid the whole problem by checking the contents of the written confirmation sent to Mill-Rite before the order was processed. While the Plaintiff's arguments concerning culpability seem sensible and fair, this Court finds that the UCC does not place an affirmative duty upon parties to read and object to confirmation forms.[4]

In applying the UCC, it is important to remember that it was written to reflect and simplify common commercial pratices. *See* ORS 71.1020. It does not always, or even usually, require parties to use the best business practices. ORS 72.2070 was written precisely because business people often do not read their mail. The drafters of the UCC realized that under ordinary circumstances there will be those who pile confirmations in a drawer and only bother to look at them after a problem develops. *See* White & Summers, *Handbook of the Law Under the Uniform Commercial Code*, pgs. 24–31 (1980). ORS 72.2070 could have been written to require parties to object to unsatisfactory terms appearing in confirmations, but it was not. Since the legislature chose not to impose upon merchants a duty to read confirmations, it is not appropriate for this Court to do so.

---

**2.** Whether the oral modification could have withstood a challenge based on the statute of frauds, *see* ORS 72.2090(3), is questionable, but that argument was not raised and therefore has been waived. *Bone Inter'l, Inc. v. Johnson*, 74 N.C.App. 703, 329 S.E.2d 714, 41 UCC Rep. 29 (1985).

**3.** The Court finds that the change in the quantity term appearing on the customer acknowledgment did not become part of the contract between the parties. This decision is not based upon ORS 72.2070(2) because that section only speaks of "additional terms" becoming part of the contract. A change in the quantity of goods purchased is not an additional term but is a different term. If one were to apply ORS 72.-

2070(2) here, as Defendant urges, the result would be the same. The addition of a quantity term other than that previously agreed to would materially alter the terms of the contract.

**4.** This is not to say that a party does not run a risk if he chooses not to read his mail. Unless they are objected to either before or after they are received, additional terms found in a confirmation which do not materially alter the contract, are deemed to be part of the contract between the parties. By giving a party the right to object to any additional terms, even though they would not be found to materially alter the contract, the UCC rewards those who do read their mail.

The Court will allow the Defendant damages of $2,402.29. This figure is taken from Mr. Bicker's testimony in which he stated that the overshipment was of doors lines one through four of Exhibit A. The Court multiplied each unit price by 32 and reduced the total by $125.40 (the price of three of the most expensive doors). The reduction is based on Mr. Bicker's testimony that "a few" of the doors were used.

■ The final counterclaim based on the Intermark transaction concerns a claim that 144 doors were not machined to the specifications upon which the parties agreed. This claim also requires the court to determine the terms of the oral contract.

Mr. Bicker testified that he ordered doors machined for Sterling flush bolts. EPI's production order, and all of EPI's notes of the transaction state that the doors are to be machined for Ives bolts. The Ives bolt is more expensive and heavier than the Sterling bolt. Mill-Rite also ordered and paid for 144 Sterling bolts prior to discovering that the doors would not accommodate them. When the doors arrived on the job site the defect was not noticed. It only became apparent in June when the doors were hung and the bolts did not fit.

The Court finds that the oral agreement was for doors machined for Sterling bolts.[5] Apparently Mr. Gheen erred in passing the order along to EPI. Mill-Rite is entitled to damages in the amount of:
$3,456.00 for the cost of the replacement bolts, minus $645.86 saved in not using Sterling bolts, and $676.00 for remaking the doors to fit the flush bolt. The Court will not allow the Defendant to recover for Mr. Bicker's adminstrative time spent to solve the bolt problem. The Defendant has failed to prove that the Defendant suffered a loss due to Mr. Bicker working on this problem.

## ALBARICI PROJECT

The Defendant also had problems with the bi-folds, identical to and ordered at the same time as the Intermark bi-folds, that it received at its Albarici job. Eventually the bi-folds split in a manner similar to the Intermark doors, although not in exactly the same way. These seemed to have a rather delayed spliting action which mislead Mill-Rite into initially thinking that they would work. When the doors eventually split, Mill-Rite notified Mr. Gheen who believes he passed the information on to EPI. Because Mr. Bicker believed at first that the problem was not wide spread, Mill-Rite repaired many of the doors. Finally Mill-Rite got fed up, and Mr. Bicker states that Mill-Rite returned 73 doors to the EPI warehouse in Denver on September 23, 1985. The doors had been ordered in December 1984 and delivered in January or Febuary 1985.

■ The Court finds that Mill-Rite properly notified EPI of the defect in the doors by notifying Mr. Gheen. ORS 72.6070(3) requires that after goods are accepted, a buyer must notify the seller of a breach within a reasonable time after he discovers the breach in order to recover damages. Mr. Gheen was the representative of EPI and was often notified of warranty problems. The notice required by ORS 72.-6070(3) is not formal notice of a defect; it is enough if the seller is warned that a problem exists. Oral notice is adequate. *Or. Lumber Co. v. Dwyer Overseas Timber, Co.*, 280 Or. 437, 571 P.2d 884 (1977).

■ The Court also finds that the doors were defective. I believe the testimony of Mr. Bicker that these doors were defective in the same manner as the Intermark doors that EPI took back. The Court is not convinced by the testimony of Mr. Jim Skelton, a former EPI employee who believed that the doors were not defective. He stated that the problem was with the installation technique of the people at the Intermark job. EPI did not tell Mr. Bicker that the doors were not defective when he visited the EPI plant after the Intermark problem. Rather, the EPI representatives told him

---

**5.** The Ives specifications found on the customer acknowledgment did not become part of the contract. *See* discussion in footnote 3.

that they had devised a new type of sleeving that they thought would remedy the defect.

The Defendant seeks damages for the cost of repairing the doors, for warehousing the doors for four months, and for the cost of 73 doors returned to the Denver warehouse. The Court will award damages of $1245.05 for the repair of the doors. This is based upon the itemization in Exhibit F. which states the amount of time spent, the job performed, and the amount paid. The Court recognizes that the Defendant made some sort of a deal with a trim carpenter to fix the doors in exchange for the services of a laborer, a truck, and a driver for 180 hours. Mill-Rite computes the damage to be equal to 180 hours x $35, but the evidence presented does not establish how this computation reflects the actual cost to repair the doors. Generally the cost of repair or replacement is used to measure damages under ORS 72.7140. *Vista St. Clair, Inc. v. Landry's Commercial Furnishings, Inc.*, 57 Or.App. 254, 643 P.2d 1378 (1982). The Court finds that Mill-Rite has failed to prove with the required degree of specificity any other damages resulting from the repair of the doors. The Defendant also has not submitted proof concerning the cost of warehousing the doors that were not used.

The Court also declines to award damages for the return of the doors to EPI's Denver warehouse. Once Mill-Rite accepted the doors, it became obligated to pay the contract price. ORS 72.6070(1). Its remedy at that time was to seek damages for the non-conformity. ORS 72.7140. The Court can find no UCC section which allows the buyer the self help remedy of dumping the goods at the seller's place of business months after they have been accepted. If Mill-Rite intended to revoke its acceptance by this action, it failed. Revocation can only be effective if it occurs within a reasonable time after the buyer discovers the defect. ORS 72.6080(2). In this case revocation occurred at least three months after the problem was discovered. This is not within a reasonable time of discovery. Thus, in light of these facts and the fact that EPI has no record of receiving these doors back, Mill-Rite must pay the contract price of these doors.

## GALBRAITH JOB

Mill-Rite claims that it was damaged in the sum of $3,400.00 on account of defective doors supplied by EPI for the Galbrath job. The defect complained of in this instance is called "glue bleed-through". This created blotches on the doors which diminished the aesthetic value of the doors. Mill-Rite notified Mr. Gheen of this problem. When Mr. Gheen visited the job site, he was not convinced that the doors themselves were defective. Mill-Rite had the doors refinished, but the problem was not remedied. The doors were not replaced, but Mill-Rite was not paid $3,400 on its contract with the construction company. It contends that this $3,400 represents the amount it was damaged by the defective doors. The Court finds that the mere fact that Mill-Rite was backcharged $3,400 by the contractor does not establish the amount of damages caused by the bleed through. Without more than Mr. Bicker's very gereral testimony as to why Mill-Rite was back charged, the Court finds that the Defendant has not adequately proved its damages.

## OTHER COUNTERCLAIMS

The Defendant also brings two claims which are unrelated to defects in the doors. First, it claims that it should be reimbursed for expenses it incurred when Mr. Bicker traveled to Oregon to visit the EPI plant. Mr. Bicker testified that he was led to believe that EPI would pay for the trip. The Court can find no basis for this claim. There was no representation made by EPI that it would pay, just an invitation to visit. Apparently, Mr. Bicker read more into the invitation than was there.

Secondly, Mill-Rite claims that EPI did not credit all of its purchases with the discount it had promised. Mr. Bicker testified that Mr. Gheen promised him a 10% discount on all items ordered through the warehouse. Mr. Gheen agrees that he did

offer such a discount beginning in December 1984 or January 1985. EPI stipulated at trial that the Defendant was entitled to the discount for all purchases from the warehouse beginning in January. Mr. Gheen and Mr. Bicker reviewed all of the Mill-Rite invoices and determined that a total credit of $1,757.20 was owed. The Court will accept this figure. It is apparent by invoices bearing discounts dated prior to January 1, 1985 that a discount agreement was in effect prior to that time as the Defendant claims.

### CONCLUSION

In conclusion, the Defendant owes $18,227.95 to EPI for goods sold and delivered. From that amount it is entitled to subtract:

| | |
|---|---|
| Intermark—cost of gathering doors | $ 830 |
| Intermark—cost of trip | $ 145 |
| Intermark—cost of overshipment | $2,402.29 |
| Intermark—cost of bolts (less cost saved) | $2,810.14 |
| Intermark—cost to refit doors | $ 676 |
| Albarici—cost of repairs | $1,245.05 |
| Credit for earned discounts | $1,757.20 |
| TOTAL COUNTERCLAIM | $9,865.68 |

█ While the invoice provisions for interest and attorney's fees are not enforceable, the Plaintiff is entitled to prejudgment interest at the rate of 1% per month and reasonable attorney's fees as specified in the credit application signed by the principles of Mill-Rite when it began business with EPI. A copy of the credit application was attached to the complaint and its authenticity was admitted by the Defendant in its answer. The Defendant does not contest that an award of attorney's fees is

proper, but it does contest the Plaintiff's right to prejudgment interest.

Defendant cites *Public Market Co. v. Portland,* 171 Or. 522, 138 P.2d 916, 918 (1943), for the rule that prejudgment interest is only awarded when:

> The demand is of such a nature that its exact pecuniary amount was either *ascertained,* or *ascertainable* by simple computation, or by reference to generally recognized standards such as market price and where the time from which interest, if allowed, must run,—that is, a time of definite default or tort feasance can be ascertained.

It argues that the amount in dispute in the case at bar was at no time ascertained, or ascertainable by simple computation because of the conflicting claim of the parties as to the amount due.

The Court finds the standard enunciated in *Public Market* to be inapplicable to the case at hand. *Public Market* and the other cases cited by the Defendant did not involve agreements to pay interest at a certain rate on sums due and owing. Those cases concerned the application of ORS 82.010(2)(a) [6] which is the statutory provision for prejudgment interest.

When the parties have an agreement that interest is due on amounts owed, it is not necessary to use the standards found in ORS 82.010(2)(a) and in *Public Market.* ORS 82.010(1) provides that if the parties agree to a rate of interest, that agreement shall be enforced. In this case, Mill-Rite agreed to pay 1% per month interest on unpaid accounts. The Court found that Mill-Rite owed sums on its account, there-

---

**6.** 82.010 Legal rate of interest. (1) Subject to the limitations in ORS 725.031, or any other provision of law, the rate of interest for any transaction shall be as agreed between the parties to the transaction.

(2) The rate of interest for the following transactions, if the parties have not otherwise agreed to a rate of interest, is nine percent per annum and is payable on:

(a) All moneys after they become due; but open accounts bear interest from the date of the last item thereof.

(b) Money received to the use of another and retained beyond a reasonable time without the owner's express or implied consent.

(c) Money due or to become due where there is a contract to pay interest and no rate specified.

(3) Except as provided in this subsection, the rate of interest on judgments and decrees for the payment of money is nine percent per annum. Interest on a judgment or decree under this subsection accrues from the date of the entry of the judgment or decree unless the judgment or decree specifies another date. A judgment or decree on a contract bearing more than nine percent interest shall bear interest at the same rate provided in the contract as of the date of entry of the judgment or decree.

fore, it will enforce the agreement as written.

This Memorandum Opinion shall constitute Findings of Fact and Conclusions of Law, and pursuant to Bankruptcy Rule 7052, they will not be separately stated. Plaintiff is directed to present an Order in accordance with this Memorandum.