CROSBY–MISSISSIPPI RESOURCES, LTD, Plaintiff,

v.

FLORIDA GAS TRANSMISSION CO. and Citrus Marketing, Inc., Defendants.

Civ. No. 2:91–272(P)(N).

United States District Court, S.D. Mississippi, Hattiesburg Division.

Feb. 23, 1993.

Glen Taylor, Harry Neblett, Jackson, MS, for plaintiff.

Barry Bowen, Christopher Barnes, Houston, TX, Robert Jackson, Hattiesburg, MS, for defendants.

## BENCH RULING

PICKERING, District Judge.

The above styled nonjury case came on for hearing February 2, 1993, and the Court having heard testimony in this case and the parties having rested, the Court ruled as follows:

This lawsuit involves the sale of natural gas from the Poplarville gas field in South Mississippi during the period of June 1987 through January 1992. The Poplarville natu-

ral gas field was developed largely by Exxon Corporation who owned eighty-six percent (86%) of the gas in at least a large portion of the field. The plaintiff, Crosby–Mississippi Resources, Ltd., a limited Mississippi partnership, owned fourteen percent (14%) of the reserves in that field.

The defendant, Florida Gas Transmission Company, owns a natural gas pipeline that runs almost through (or very near) the Poplarville field. This pipeline runs from West Texas to South Florida. On August 28, 1985, the defendant, Florida Gas, entered into a contract with Exxon to purchase Exxon's gas from the Poplarville field. Almost a year later on August 15, 1986, the plaintiff, Crosby, entered into a contract with the defendant to sell their fourteen percent (14%) interest to the defendant, Florida Gas.

The original contract between plaintiff, Crosby, and defendant, Florida Gas, was not a contract that was negotiated paragraph by paragraph between those two parties, but was primarily a ratification of the Exxon contract with Florida Gas, with very few changes. The contract provided for gas to be purchased by defendant, Florida Gas, at different prices during different time intervals during the first months of the contract. The contract further provided that after the contract had been in force for fifteen (15) months, the defendant, Florida Gas, could elect to discontinue the purchases at the price provided for in the contract by notifying the sellers that they would no longer take gas from the sellers at the price provided for in the contract. This thirty (30) day notice was referred to as the market-out provision.

The contract provided two other pertinent provisions. One of the provisions provided that any modification, rescission or waiver of any of the contract provisions had to be in writing. The contract further provided that any statement of account that was not objected to within two years would be conclusively presumed to be valid.

In February 1987 the price that the defendant, Florida Gas, would have paid under the contract was higher than Florida Gas was willing to pay, and both Exxon and plaintiff, Crosby, agreed to a modification in writing that would last until March 31 of that year.

On or about that time or shortly thereafter, both Exxon and plaintiff, Crosby, agreed in writing to an additional modification providing for a lower price for the purchase of the gas until May 31, 1987.

On February 12 1987, Florida Gas submitted to Crosby an additional proposed modification, which would have provided for a second delivery point for the purchase of gas from the plaintiff, and additionally would have eliminated what has been referred to as the 109 floor price. The 109 floor price was the maximum amount that could be paid for certain natural gas under federal law. It would not have controlled the purchase of this gas except by contract of the parties. Mr. Gammill, who is the chief operating officer of the plaintiff, advised the defendant, Florida Gas, at that time that he was not interested in waiving the 109 price. Later in May, the other part of the February 12 attempted modification was agreed to by the parties and they adopted a written modification as to the second point of delivery for plaintiff's gas.

Although there was no written modification of the agreement between plaintiff, Crosby, and defendant, Florida Gas, effective after May 31, 1987, as to the price to be paid for plaintiff's gas, nevertheless, Florida Gas paid to plaintiff and plaintiff accepted, for some four and one-half years, payment for its gas in an amount far less than the 109 floor price. The amount paid to plaintiff was the amount specified in a letter drafted by defendant, Florida Gas, dated June 4, 1989, and submitted to, but not signed by, the plaintiff, Crosby. This June 4 letter, had it been signed by the plaintiff, Crosby, would have deleted the 109 floor price. By this suit the plaintiff seeks to recover the difference between what they were actually paid and the amount they would have received under the 109 floor price.

The Court finds that this case is controlled by the Uniform Commercial Code, which has been adopted by the State of Mississippi. The statutes that apply are MISS.CODE ANN. § 75–2–208(1) and (3) and MISS.CODE ANN. § 75–2–209(4). Subsection (1) of MISS.CODE ANN. § 75–2–208 provides that "where the

contract for sale involves repeated occasions for performance by either party with knowledge of the nature of performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant in determining the meaning of the agreement." MISS.CODE ANN. § 75–2–208(1) (1972). Subsection (3) of MISS.CODE ANN. § 75–2–208 provides further, "Subject to the provisions of Section 75–2–209 on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance." MISS.CODE ANN. § 75–2–208(3) (1972). Subsection (4) of MISS. CODE ANN. § 75–2–209 provides, "Although an attempt at modification or rescission does not satisfy the requirements of Subsection (2) or (3), it can operate as a waiver." MISS. CODE ANN. § 75–2–209(4) (1972).

■ This Court has previously ruled that the plaintiff cannot recover any additional sum on any gas sold as to which the statements from the defendants to the plaintiff itemizing such purchases were rendered more than two years prior to plaintiff's objecting to the defendants as to the accuracy of such statements. The Court finds that the plaintiff did not object to the defendants' failing to pay the 109 floor price until December 30, 1991. The statement or itemization for the November 1989 gas purchases was delivered to plaintiff on December 27, 1989. The plaintiff's objections were made two years and three days after the plaintiff received its November statement. Therefore, the two-year presumption of accuracy provision applied to the November 1989 gas statement and all statements for gas sold prior to November 1989. The Court has previously noted that this issue is controlled by the case of *Exxon Corporation v. Crosby–Mississippi Resources* decided by Judge Barbour of this district in 1991. 775 F.Supp. 969 (S.D.Miss. 1991). The Court would point out that there is nothing in this ruling in regard to the two-year objection that has any bearing on the statute of limitations. The plaintiff could have objected to such invoice or statement within the two years and could have still sat back for an additional four years before suit was filed if the matter could not be resolved amicably between the parties. The Court does not find that this contravenes the Mississippi statute that provides that parties cannot stipulate or contract for a statute of limitations different than provided in the Mississippi Code. *See* MISS.CODE ANN. § 15–1–5 (1972). The Court would point out that the provision in the contract requiring objection within two years after an invoice or statement or bill is rendered is based upon common sense that a party ought to have some notice before records are destroyed and while evidence is still available.

■ When this Court heard oral argument in regard to the Motions for Summary Judgment, the Court had some questions about the fact that the contract provision involved in this case is somewhat broader than the Statute of Frauds that is found in the Mississippi version of the UCC in that the contract provided that any modification, rescission, as well as "waiver" had to be in writing. In that regard, the Court thought the word "waiver" could have been used as a word of art (attempting to avoid subsection 4 of MISS. CODE ANN. § 75–2–209 (1972)); however, the plaintiff presented no evidence to indicate that it had any particular interpretation of the word "waiver." In fact, the plaintiff basically relied on Exxon to negotiate its original contract and the plaintiff merely ratified it. The plaintiff having offered no evidence in that regard and the witnesses for the defendants having testified that this was a boilerplate section of the contract prepared by attorneys and that the parties responsible for the negotiation of this contract on behalf of defendants not having really any opinion as to why the word "waiver" was in there or was not in there, the Court finds that the word "waiver" was not used as a term of art attempting to bring this contract out from under subsection (4) of MISS.CODE ANN. § 75–2–209 (1972). Instead the paragraph that contained the word "waiver" was a rather thorough paragraph, and the term "waiver" was basically used synonymously for modification and rescission. Consequently, the cases interpreting the UCC Statute of Frauds are applicable in this case.

When this case was presented to the Court on motion for summary judgment, the Court was reluctant to decide the issue of waiver entirely on the limited record before the Court at that time. The Court felt that hearing testimony in regard to the alleged waiver, testimony relative to entering into the contract and testimony relative to the conduct of the parties since June 1987, would be helpful to the Court in arriving at its decision.

In a nonjury case the Court is required to make findings of fact and to determine issues of credibility of the witnesses, which is never an easy job. But the fact that it is not an easy job does not exempt the Court from the duty and responsibility of doing so. So the Court has to consider the demeanor of the witnesses, the recollection of the witnesses, the corroborating information, as well as the course of conduct—the performance of the parties if you will—and make a decision on disputed factual issues. In this case, the question of whether there was a verbal agreement between the parties, the essence of which was set out in the letter of June 4, 1987, is a disputed question of fact. The plaintiff has offered one witness to say that there was no such agreement. The defendants have the burden of proving this affirmative defense by a preponderance of the evidence. They presented two witnesses on this issue. Having observed the witnesses, having heard the testimony, and having considered all of the corroborating testimony and the other corroborating evidence, which would support or disprove the contentions of either side, it is the opinion of this Court that the parties entered into an oral or verbal agreement to change the original contract sometime prior to June 4, 1987, and that this agreement that they entered into verbally was basically as set out in the letter of June 4, 1987. The Court finds that Mr. Gammill was aware from June 1987 forward that Crosby was not being paid according to the 109 floor price even though Mr. Gammill might not have known the exact amount of the floor price. The Court comes to these conclusions after considering a number of things: The Court found highly probative Exhibits D-6 through D-45, being the telephone logs of Mr. Gammill. In the opinion of

the Court, Mr. Gammill seemed to reluctantly acknowledge that the conversations took place as recorded in his logs and, other than that, had little recollection and little explanation for seeming inconsistencies or matters that seemed to be contrary to other evidence. For instance, the plaintiff, according to these exhibits that the Court has just referred to, was fully aware of what the floor price was (at least at the time of one of the phone conversations) and stated that he did not want to get rid of it, but he did waive it rather than have the market-out provision injected on two occasions. And when Mr. Gammill didn't agree with the February 12 letter, he contacted defendants and told them he disagreed. However, Mr. Gammill did not do that in regard to the letter of June 4. Mr. Gammill testified as to what he did not say but could not remember what he did say in response to Florida Gas' request to change the price of the gas.

The plaintiff—or rather Mr. Gammill acting on behalf of the plaintiff—acknowledged that he was aware that early in the year 1987 the 109 floor price was at least 40 cents or some 20 percent more than what the defendant, Florida Gas, was paying. The evidence establishes that the first check would have been $150,000 more, according to the 109 floor. It is inconceivable to the Court that someone who called on numerous occasions asking when checks would be available; how they were calculated, having this knowledge and twenty (20) years experience in the oil and gas business, would not have been aware that he was not being paid according to the 109 floor price. If someone would go to the trouble of making regular trips to Houston to pick up a check, to get it back and deposit it in the bank in New Orleans, it's not likely that they would have paid so little attention to a check that was $150,000 short.

Furthermore, Exhibit P-65, a check in the amount of $413,721.26 dated July 28, 1987, has notations indicating that it was received by the plaintiff on July 30, 1987. Further notations on the front of a copy of that check shows that it was deposited on September 8, 1987, which indicates that it was held by the plaintiff for over a month after it was received. Mr. Gammill expressed dismay as to

why this happened, yet when Mr. Gammill came back to the stand on the last day of the trial he offered no explanation to the Court in this regard.

█ Having made that finding, the Court finds as a matter of law that this modification is not enforceable because it violates the Statute of Frauds contained in the UCC and in the contract provision. However, the Court finds that this is a classic case for waiver under subsection (4) of MISS. CODE ANN. § 75–2–209 since there was an attempt at modification or rescission.

The Court further notes that even if this Court had not found specifically that there was an oral agreement to modify, that nevertheless, based upon holdings by other courts' interpreting this provision of the UCC, the Court is of the opinion, after reviewing these cases, that even an unilateral attempt to modify the contract by Florida Gas and four and one-half years going by with the plaintiff receiving and depositing these checks, the separate conduct of both parties constituted a waiver of the 109 floor price. *See Linear Corp. v. Standard Hardware Co.*, 423 So.2d 966 (Fla.Dist.Ct.App.1982); *Blue Rock Indus. v. Raymond Int'l, Inc.*, 325 A.2d 66 (Me.1974); *J.W. Goodliffe & Son v. Odzer*, 283 Pa.Super. 148, 423 A.2d 1032 (1980). However, the Court has found that there was an attempt by both parties to modify it orally, although the writing was never signed by the plaintiff, Crosby. The plaintiff, Crosby, clearly did not sign the letter of June 4. However, the Court is of the opinion that Mr. Gammill indicated to the agents of the defendant, Florida Gas, that he agreed to the modification just as testified to by the agents of defendant, Florida Gas.

█ The Court would note that in the opinion of this Court, the stamped notation on the backs of the checks, which was done in the ordinary course of business by the plaintiff, did not preserve their rights. The stamp itself was not an objection; it simply said "We reserve all rights." The language of the stamp indicates that it was prepared for oil and gas leases, pooling agreements, unitization agreements and did not indicate that it was for a contract for the sale of natural gas. Although the Court thinks that

the language was probably broad enough in the last sentence that if there had been clerical errors that were objected to within two years, that stamping the checks would have preserved those clerical errors for such two year period. Since there was no objection made within the two years, the Court does not think that stamping the backs of the checks satisfied the requirement for an objection. The Court also does not think that the stamp kept the course of conduct from being that which is spoken of in MISS.CODE ANN. §§ 75–2–208 and 75–2–209. Such course of conduct, even after stamping the checks with this reservation, falls within the ambit of these code sections and constituted a waiver.

The Court thinks the case of *J.W. Goodliffe & Son v. Odzer*, 283 Pa.Super. 148, 423 A.2d 1032 (1980), is insightful. *Odzer* is a correct statement of the law relative to these two sections of the UCC. And even more importantly, the Court relies upon the Fifth Circuit case of *T.J. Stevenson & Co. v. Bags of Flour*, where the Fifth Circuit interpreting these provisions of the UCC stated "the combination of §§ 2–208(3) and 2–209(4) establishes that the parties' course of performance after execution of the contract can operate as a waiver of specific contractual provisions." *T.J. Stevenson & Co.*, 629 F.2d 338, 365 (5th Cir.1980). This case has some other passages that the Court thinks pertinent to this case.

Some of the authorities in discussing waiver have said that the waiver provision of the UCC is an equitable provision used to soften the harshness of the rigidity of the rule that no contract can be modified except in writing in spite of a course of conduct to the contrary. *See Marlowe v. Argentine Naval Comm'n*, 808 F.2d 120, 124 (D.C.Cir.1986). It's pointed out that inequitable results sometimes could result from the harshness of the "no modification except in writing" rule. The Fifth Circuit case of *Mid–South Packers, Inc. v. Shoney's, Inc.*, 761 F.2d 1117 (5th Cir.1985) is likewise instructive.

The Court finds that the plaintiff has proven the prerequisites for equitable estoppel by a preponderance of the evidence; however,

based upon the previous ruling of the Court, it is not necessary for the Court to base its opinion upon equitable estoppel. If the Court were to decide whether equitable estoppel applies to this case, the Court would consider the philosophy of equitable estoppel as set forth by the Mississippi Supreme Court, which this Court is *Erie* bound to follow, in *PMZ Oil Co. v. Lucroy,* 449 So.2d 201 (Miss.1984). Even though the *PMZ Oil Co.* case refers to equitable estoppel in regard to the general Statute of Frauds and not the UCC Statute of Frauds, the Court finds that the language in that case indicates some of the problems that can arise when someone has a conversation and acknowledges that they had a conversation about changing the contract, and then the contract is, in fact, changed by the other party and relied upon by that party. Time passes and then the party that once acknowledged the conversation begins to protest the fact that there has been a change in the contract, which the parties did not agree to in writing. The Court thinks that the reasoning of *PMZ Oil Co.* is analogous to the situation in this case. The most evident indication of the oral agreement in the present case is the fact that four and a half years went by before the plaintiff began to protest and say, "But I didn't agree to that even though I've been cashing checks for four and a half years and the difference amounts to almost ten million dollars." The Court recognizes that *T.K. Stanley v. Scott Paper Co.,* 793 F.Supp. 707 (S.D.1992), a recent case decided by Judge Lee of this district, holds that equitable estoppel is not an exception to the UCC Statute of Frauds. The facts in the case at hand are completely opposite to the facts in the *T.K. Stanley* case, *supra,* in as far as equitable considerations are concerned.

The Court would further note that if Crosby had notified Florida Gas and advised that Crosby was unhappy with the price Crosby was being paid for their natural gas and wanted to be paid the 109 floor, then Florida Gas within thirty (30) days would have gotten out of the contract through the market-out clause. Representatives of the defendants have testified unequivocally that they would have done that and the Court finds no reason to disbelieve this testimony.

The Court further notes that there was a valid reason for Crosby not objecting to the oral modification because Crosby knew if they did object Florida Gas could opt out under the market-out provision. And in fact the evidence at trial showed that when Crosby did object and expressed an unwillingness to take a price less than the 109 floor, Citrus Marketing Co., as assignee of Florida Gas, exercised their option of marketing out and Crosby is now receiving ten percent less for their natural gas than what they received for four and one-half years according to the oral modification. So the market out provision was an incentive for the plaintiff to go along with the modification.

Based upon the above findings, it is the opinion of the Court that the defendants have established their affirmative defense of waiver under the UCC and that the plaintiff should take nothing.

A judgment will be entered accordingly.

SO ORDERED AND ADJUDGED.