**COASTAL & NATIVE PLANT SPECIALTIES, INC.,**
Plaintiff,

v.

**ENGINEERED TEXTILE PRODUCTS, INC., Defendant.**

**Engineered Textile Products, Inc.,**
Third–Party Plaintiff,

v.

**Occidental Chemical Corporation,**
Third–Party Defendant.

No. 3:98–CV–386/LAC.

United States District Court,
N.D. Florida,
Pensacola Division.

March 28, 2001.

Diane Longoria, Pensacola, FL, for Plaintiff.

Tom Jenkins, Dennis Larry, Pensacola, FL, for Defendant.

## ORDER DENYING SUMMARY JUDGMENT

COLLIER, District Judge.

THIS CAUSE comes before the Court on Third–Party Defendant OCCIDENTAL CHEMICAL CORPORATION's ("Oxy-Chem") motion for summary judgment and documents in support thereof (docs. 144–47, 154). Defendant/Third–Party Plaintiff ENGINEERED TEXTILE PRODUCTS, INC. ("ETP") timely filed a memorandum and evidentiary materials in opposition (docs. 149–51). The Court has taken summary judgment under advisement (doc. 148) and is now prepared to rule on Oxy-Chem's motion. For the reasons stated below, the motion for summary judgment is DENIED.

## I. STATEMENT OF THE CASE

The Court hereby adopts the factual and procedural background of the case as articulated in its order denying ETP's motion for summary judgment entered on January 30, 2000 (doc. 95 at 2–8), which is attached as an appendix. Only minimal attention need be given to the factual and procedural aspects of the case relevant to this Order.

ETP filed its first third-party complaint against OxyChem on January 27, 1999—seven days before the discovery deadline and twenty-seven days before motions for summary judgment were to be filed—seeking indemnification for any damages suffered as a result of Plaintiff's cause of action (docs. 46, 48, 50). Shortly thereafter, ETP filed a motion for summary judgment against Plaintiff, which was denied on January 30, 2000 (doc. 95). While this motion was pending before the Court, Oxy-Chem filed an amended motion to reopen discovery (doc. 83). Because it was technically brought into this case after the original discovery period, OxyChem requested that it be permitted to conduct its own discovery after the adjudication of ETP's motion.

The Court granted OxyChem's motion and directed OxyChem to complete its discovery in ninety days (doc. 96). ETP then filed a second amended third-party com-

plaint (doc. 101). After the discovery period was extended an additional sixty days (doc. 123), OxyChem filed a motion for summary judgment and documents in support thereof (docs. 144–47, 154). The Court took summary judgment under advisement (doc. 148) and Plaintiff thereafter filed a memorandum and evidentiary materials in opposition (docs. 149–51).

For purposes of ruling on OxyChem's motion, the following facts are viewed in a light most favorable to ETP.[1] ETP is an Alabama corporation incorporated in 1980, with its principal place of business in Alabama, and is in the business of industrial textile fabrication (doc. 145 ¶ 17). ETP traces its roots in the business back more than one hundred years (*Id.*). Between January and May of 1997, ETP sold Plaintiff COASTAL & NATIVE PLANT SPECIALTIES, INC. ("Coastal") ten polyvinyl chloride ("PVC") liners (*Id.* ¶ 4). The first four liners were made of 30 mil industrial grade PVC, while the last six liners were made of 35 mil fishgrade PVC (*Id.*). ETP ordered the material used to fabricate the first four liners from OxyChem on November 13, 1996 (*Id.* ¶ 5).[2] It received that material on November 17, 1996 (*Id.* ¶ 5). ETP marked OxyChem's invoice as "RECEIVED" on November 18, 1996 (*Id.*). ETP paid all amounts due on February 24 and 27, 1997 (*Id.*). ETP ordered the material used to fabricate the remaining six liners from OxyChem on October 4, 1996 (*Id.* ¶ 6).[3] It received that material on October 11, 1996 (*Id.*). ETP marked Oxy-

Chem's invoice as "RECEIVED" on October 14, 1996 (*Id.*). ETP paid all amounts due on February 24, 1997 (*Id.*).

Printed in blue type at approximately 1/16th of an inch in height, the following language appears on the bottom-left, frontside of OxyChem's invoices: "Subject to terms and conditions printed on back hereof." On the back of each OxyChem invoice, under the title "OCCIDENTAL CHEMICAL CORPORATION'S INVOICE TERMS AND CONDITIONS," the following terms appear:

1. ENTIRETY OF CONTRACT: *Seller's acceptance of Buyer's order and shipments made pursuant thereto are subject to and expressly conditioned upon Buyer's acceptance of the terms and conditions herein* unless this transaction is subject to a previous applicable contract and signed by Seller. If there is no such contract, the terms and conditions contained herein constitute the contract covering such order and shipments and the entire understanding between the parties relating thereto, and *none of Buyer's terms and conditions in acknowledging this invoice or in issuing any purchase orders, releases, shipping instructions or otherwise shall apply.* Buyer shall be deemed to have assented to the provisions hereof in all respects by its acceptance of any goods shipped or by failure to give Seller written notice of objection within five business days of Buyer's receipt of this invoice. Seller

---

1. Furthermore, some of the facts are construed according to Local Rule 56.1(A). If the Court cites to OxyChem's statement of undisputed material facts (doc. 145), then that fact has been deemed admitted for the limited purpose of ruling on its motion for summary judgment.

2. The terms of Purchase Order No. 15336 required OxyChem to ship the requested material to ETP via Yellow Freight or Conway, F.O.B., and ASAP–Rush (doc. 146: Taylor

Decl. ¶¶ 2–4, Exh. 2). The purchase order did not contain terms for price or amount. According to the record, ETP's purchase order did not contain any other terms.

3. The terms of Purchase Order No. 15232 required OxyChem to ship the requested material to ETP F.O.B. and ASAP (doc. 146: Taylor Decl. ¶¶ 2–4, Exh. 2). The purchase order did not contain terms for price or amount. According to the record, ETP's purchase order did not contain any other terms.

shall not be bound by any change in, addition to, or waiver of any of the provisions hereof unless approved in writing by an authorized representative of Seller.

. . . .

4. WARRANTIES: Seller's recommendations or instructions as to handling, use, or disposal of any Product, including its use alone or in combination with other products, or as to any apparatus or process or the use of any Product in connection therewith, are based upon information believed to be reliable, but Seller shall have no liability with respect thereto. SELLER'S SOLE AND EXCLUSIVE WARRANTY IS THAT ITS PRODUCT COMPLIES WITH ITS STANDARD CHEMICAL AND PHYSICAL SPECIFICATIONS, SELLER MAKES NO OTHER WARRANTIES EITHER EXPRESS OR IMPLIED, WHETHER WITH RESPECT TO ITS RECOMMENDATIONS, INSTRUCTIONS, PRODUCT APPARATUS, PROCESS OR OTHERWISE, AND SPECIALLY DISCLAIMS ANY IMPLIED WARRANTIES, WHETHER OF MERCHANTABILITY, SUITABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.

. . . .

7. CLAIMS; LIABILITY: ... As to any claim of any nature, whether in contract, tort, strict liability, patent infringement or otherwise, Seller's and its affiliates' total liability shall not exceed the purchase price of the portion of the Product in respect of which such claim is made plus any transportation charges thereon paid by Buyer. In no event shall Seller and its affiliates be liable for any indirect, consequential, special, incidental or contingent damages, costs of litigation or for loss. It is agreed and understood that the price stated for the Product is a consideration in limiting Seller's liability.

. . . .

9. LIABILITY AND RESPONSIBILITY: Except to the extent that such is solely and directly caused by any breach of Seller's obligations hereunder, Buyer assumes full responsibility for any liability arising out of unloading, discharge, storage, handling, use and disposal of any Product or container therefor, including the use of such Product or container alone or in combination with other substances .... Buyer shall defend, indemnify and hold harmless Seller, and its affiliates, and their respective representatives and employees, from and against all losses, liabilities, damages, and expenses made against or incurred by Seller and its affiliates, and their respective representative and employees, arising out of any claim, suit or proceeding by any governmental agency or any third parties (including without limitation any employee of Buyer or member of his family) which claim, suit or proceeding alleges death, personal or economic injury or damages to any private or public property or resources caused or contributed to by the Product or container therefor if such death, injury or damage occurred subsequent to shipment of the Product, except to the extent such is solely and directly caused by the failure of the Product to meet Seller's standard physical and chemical specifications.

. . . .

16. JURISDICTION: THE PARTIES HERETO AGREE THAT ALL OF THE PROVISIONS OF THIS AGREEMENT AND ANY QUESTIONS CONCERNING ITS INTERPRETATION AND ENFORCEMENT SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE

OF NEW YORK, U.S.A. AND THE ORDERING AND DELIVERY OF PRODUCT SHALL BE DEEMED TO BE THE TRANSACTION OF BUSINESS WITHIN THE STATE OF NEW YORK FOR PURPOSES OF CONFERRING JURISDICTION UPON COURTS LOCATED WITHIN THE STATE. THE PARTIES AGREE THAT ANY LITIGATION ARISING OUT OF THIS AGREEMENT SHALL BE BROUGHT ONLY IN THE FEDERAL OR STATE COURTS IN THE STATE OF NEW YORK AND BOTH PARTIES CONSENT TO THE JURISDICTION OF SAID COURTS.

(doc. 149, Exh. 1) (first and second emphasis added, third and forth emphasis in original). This language is printed in very light-grey type at approximately 1/16th of an inch in height. Similar terms and conditions appeared on the back of all of OxyChem's invoices to ETP, including invoices predating the ones from above (doc. 145 ¶ 8).

OxyChem also provides data sheets on all of its products. Under the heading "Typical Properties," the data provided for "Dimensional Stability" states that 35 Mil PVC liners have a maximum percent change—*i.e.*, shrinkage—of less than 3% or less than 5% (depending on the data sheet) when a small sample of it is exposed to a temperature of 212° Fahrenheit for 15 minutes (doc. 147: Lauwers Dep. at 6–10 & Exhs. 1–2). The data sheet for 30 Mil PVC states that such liners have a maximum percent change, in each direction, of 5% or less than 3% (depending on the data sheet) when a small sample is exposed to the same conditions (*Id.* at 12 & Exhs. 4–5; doc. 146: Taylor Decl. at Exh. 5). Language at the bottom of the front and back page of the data sheets for both 30 and 35 Mil PVC liners states: "This information is not intended to be all-inclusive as the manner and conditions of use, handling, storage and other factors may involve other or additional safety or performance considerations." (doc. 146: Taylor Decl. at Exh. 5). In full, the disclaimer on the front side of OxyChem's data sheets states:

The information contained herein was prepared by technical personnel and is true and accurate to the best of our knowledge and experience. However, OXYCHEM DOES NOT MAKE ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE, EXPRESS OR IMPLIED, REGARDING PERFORMANCE, STABILITY OR OTHERWISE. FURTHERMORE, THE INFORMATION CONTAINED HEREIN IS NOT TO BE CONSTRUED AS AN EXPRESS WARRANTY CONCERNING THE PERFORMANCE, STABILITY OR OTHER CHARACTERISTICS OF THE PRODUCT. The information is not intended to be all-inclusive as the manner and conditions of use, handling, storage and other factors may involve other or additional safety or performance considerations. While our technical personnel will respond to any question regarding safe handling and use procedures, safe handling and use remains the responsibility of the customer. No suggestions for use are intended as, and nothing herein shall be construed as, a recommendation to infringe any existing patents or to violate any Federal, State, or local laws. The purchase of our product is subject to our terms and conditions, which are available upon request.

(*Id.*) (emphasis in original). Similarly, the full disclaimer on the back side of OxyChem's data sheets reads as follows:

IMPORTANT! The information presented herein, while not guaranteed, was

prepared by technical personnel and is true and accurate to the best of our knowledge. No warranty of guaranty, express or implied, is made regarding performance, stability or otherwise. This information is not intended to be all-inclusive as the manner and conditions of use, handling, storage and other factors may involve other or additional safety or performance considerations. While our technical personnel will be happy to respond to questions regarding safe handling and use procedures, safe handling and use remains the responsibility of the customer. No suggestions for use are intended as, and nothing herein shall be construed as, a recommendation to infringe any existing patents or to violate any Federal, State or local laws.

(*Id.*) (emphasis in original). Other promotional literature provided by OxyChem to ETP also contains disclaimers and advisories similar to those appearing on the front side of OxyChem's data sheets (doc. 145 ¶ 12).

ETP alleges that it is being sued by Coastal for damages sustained as a result of the PVC containment liners sold to Coastal by ETP (*Id.* ¶ 1). Coastal's damages allegedly stem from liner shrinkage and chemicals leaching out of the liners. ETP's cause of action against OxyChem is based upon OxyChem's breaches of implied and express warranties, and upon OxyChem's negligent misrepresentations. ETP claims that it reasonably relied upon OxyChem's representations and warranties when it purchased PVC material from OxyChem and when it fabricated liners for Coastal using that material (*Id.*). ETP identified two types of representations or warranties allegedly made by OxyChem. According to ETP, OxyChem represented (1) that shrinkage of the PVC would be limited to the percentages set forth in the data sheets and (2) that PVC was fit for

use as a tank liner in hydroponic farming (*Id.* ¶ 3).

With regard to the first representation, the only communication identified by ETP as a representation or warranty was the information printed on the data sheets, and more specifically the information pertaining to "dimensional stability." (*Id.* ¶ 9). With regard to the second representation, the only communication identified by ETP as a representation or warranty was a telephone conversation between Carter Damp, an ETP salesman, and David Lauwers, OxyChem's "Film & Compound" manager (*Id.* ¶ 14). The conversation between Damp and Lauwers took place after ETP purchased the PVC material from OxyChem and after ETP sold the first four liners to Coastal (*Id.*). When Damp contacted Lauwers, he did so to obtain free technical support (*Id.* ¶ 15). Damp recalled that he asked Lauwers whether PVC fishgrade material would work as a liner for a tank in which onions would be hydroponically grown for human consumption, and that Lauwers responded that he saw no reason why it would not work (*Id.*).

## II. MOTION FOR SUMMARY JUDGMENT

### A. *Standard*

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, show that no genuine issue of material fact exists and that the party moving is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue of fact is material if it is a legal element of the claim under the applicable

substantive law which might affect the outcome of the case. *Id.*

At the summary judgment stage, a court's function is not to weigh the evidence to determine the truth of the matter, but to determine whether a genuine issue of fact exists for trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. A genuine issue exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party. *Id.* "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir.1992) (citing *Mercantile Bank & Trust Co. v. Fidelity & Deposit Co.,* 750 F.2d 838, 841 (11th Cir.1985)).

When assessing the sufficiency of the evidence in favor of the nonmoving party, the court must view all the evidence, and all factual inferences reasonably drawn from the evidence, in the light most favorable to the nonmoving party. *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 918 (11th Cir.1993). The court is not obliged, however, to deny summary judgment for the moving party when the evidence favoring the nonmoving party is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. A mere scintilla of evidence in support of the nonmoving party's position will not suffice to demonstrate a material issue of genuine fact that precludes summary judgment. *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990).

### B. Discussion

Whether ETP has a right to indemnification is not an issue presently before the Court. *See generally Morse/Diesel, Inc. v. Trinity Indus., Inc.,* 655 F.Supp. 346, 360 (S.D.N.Y.1987) (stating "[t]he right to indemnification may arise out of an express agreement of indemnification, or it may be implied by law in favor of one who is held liable solely by imputation of law because of its relation to the actual wrongdoer"), *rev'd on other grounds,* 859 F.2d 242, 244 n. 1 (2d Cir.1988); *Jordan v. Madison Leasing Co.,* 596 F.Supp. 707, 709 (S.D.N.Y.1984) (stating "indemnity is allowed where the party seeking indemnity was not personally at fault and did not actually contribute to the injury, but was held liable to the plaintiff only vicariously"); 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice And Procedure §§ 1441–1465 (2d ed.1990) (discussing third-party practice). Assuming it does, the Court is faced with the daunting task of figuring out whether OxyChem can limit all or part if its liability. OxyChem's motion for summary judgment requires this Court to decide issues that can only be reconciled by a strict application of Article 2 of the Uniform Commercial Code ("UCC").[4]

OxyChem offers five arguments in support of its motion for summary judgment.

---

**4.** OxyChem argues the Court should apply New York law. ETP responds by stating the choice of law on warranty issues makes no difference because New York, New Jersey, Alabama, and Florida have all adopted the UCC. *See, e.g.,* Ala Code §§ 7–2–101 to –725 (WESTLAW through 2000 Reg. Sess.); Fla. Stat. Ann. §§ 672.101–.724 (West 1993 & Supp.2001); N.Y.U.C.C. Law §§ 2–101 to – 725 (McKinney 2000). ETP also relies upon New York law in its responsive memorandum. Because both parties apparently feel

the application of New York law would not be detrimental, the Court elects to apply New York law to the issues presented in OxyChem's motion. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Forzley v. AVCO Corp. Elecs. Div.,* 826 F.2d 974, 978–79 (11th Cir.1987); *Coastal Indus., Inc. v. Automatic Steam Prods. Corp.,* 654 F.2d 375, 378– 79 & n. 6 (5th Cir. Unit B 1981); *Dep't of Motor Vehicles v. Mercedes–Benz of N. Am., Inc.,* 408 So.2d 627, 629 (Fla. 2d DCA 1981).

First, OxyChem argues the invoice terms limits its liability for any claim in contract or tort to the purchase price of the material with respect to which the claim is made, and exclude liability for any indirect, consequential, special, incidental or contingent damages, costs of litigation or for loss. Second, it claims the alleged representations do not constitute express or implied warranties and, at any rate, it disclaimed the alleged warranties. Third, it maintains any tort claim asserted by ETP is barred by the economic loss rule or the absence of privity. Fourth, OxyChem contends it made no material representation of fact and ETP was not justified in relying as it did on the representations. Fifth, it argues ETP's claim for indemnification based on damages caused by shrinkage of the PVC is barred by ETP's own negligence.

### 1. Contract Formation

This case involves a classic "battle of the forms" situation which can only be resolved by section 2–207 of the UCC. The drafters of the UCC designed this section to "allow parties to enforce their agreement ... despite discrepancies between a written offer and a written acceptance." 1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 1–3 n. 1 (4th ed.1995) [hereinafter WHITE & SUMMERS]. It states as follows:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time

operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, *unless acceptance is expressly made conditional on assent to the additional or different terms.*

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract· unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provision of this Act.

N.Y. U.C.C. LAW § 2–207 (emphasis added).[5] Thus, section 2–207 contemplates contract formation via three different routes. *See JOM, Inc. v. Adell Plastics, Inc.,* 193 F.3d 47, 53–54 (1st Cir.1999); *Diamond Fruit Growers, Inc. v. Krack*

---

5. The UCC defines a merchant as:
    [A] person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.
    N.Y. U.C.C. LAW § 2–104(1). Any transaction "between merchants" signifies "both parties

are chargeable with the knowledge or skill of merchants." *Id.* § 2–104(3). Clearly, ETP and OxyChem are merchants. As such, their transactions were "between merchants." Furthermore, because ETP and OxyChem entered into their agreements in 1996, the Court will apply the 1996 version of the New York UCC. All subsequent citations to the UCC are to the 1996 version unless otherwise indicated.

*Corp.*, 794 F.2d 1440, 1443–44 (9th Cir. 1986); *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1166 (6th Cir.1972); WHITE & SUMMERS § 1–3. Under subsection (1), the parties may form a contract by satisfying the language up to the comma. The parties can also form a contract by satisfying the language after the comma (also known as the "proviso"). Subsection (3) provides the third and final method of forming a contract. Therefore, before the Court can decide what terms govern ETP and OxyChem's agreements, the Court must determine the manner in which the parties formed their contracts.

■ In the case *sub judice*, OxyChem never accepted ETP's purchase orders. OxyChem's invoices made its acceptance "subject to and expressly conditioned" upon ETP's assent to the terms and conditions printed on the reverse side of the invoices. The invoices also expressly rejected ETP's terms. Thus, under the UCC, each invoice did not operate as an acceptance. *See id.* § 2–207(1) & cmt. 2. OxyChem's invoices were counteroffers. *See JOM*, 193 F.3d at 53; *Dorton*, 453 F.2d at 1166, 1168; WHITE & SUMMERS § 1–3. The record fails to show ETP assented to the additional terms. Consequently, the parties never formed legally binding contracts upon the exchange of their written documents. This conclusion remains true notwithstanding the language in OxyChem's invoices stating "Buyer shall be deemed to have assented to the provisions hereof in all respects by its acceptance of any goods shipped or by failure to give Seller written notice of objection within five business days of Buyer's receipt of this invoice." Once OxyChem made a counteroffer, a contract could only be formed by ETP's express acceptance of the terms. *See JOM*, 193 F.3d at 53; *Diamond Fruit Growers*, 794 F.2d at 1443; *Leonard Pevar Co. v. Evans Prods. Co.*,

524 F.Supp. 546, 551 (D.Del.1981). ETP's acceptance of the goods or failure to object does not constitute "assent" within the meaning of section 2–207(1). *See Ionics, Inc. v. Elmwood Sensors, Inc.*, 110 F.3d 184, 189 (1st Cir.1997); *Diamond Fruit Growers*, 794 F.2d at 1444–45; *Dorton*, 453 F.2d at 1168 & n. 4; *cf.* N.Y. U.C.C. LAW § 2–207 cmt. 3 (stating if additional or different terms are such that might materially alter the original bargain, "they will not be included unless expressly agreed to by the other party"). A contrary result would undermine the purpose of section 2–207. "That is, the last form would always govern." *Ionics*, 110 F.3d at 189.

■ This does not mean, however, the parties failed to form a contract. OxyChem shipped the goods after receiving ETP's purchase orders. ETP accepted the goods and paid for them before any dispute arose. Without a doubt the parties acknowledged the existence of a contract every time they conducted business with each other. *See* N.Y. U.C.C. LAW § 2–207 cmt. 7. Therefore, section 2–207(3) governs and the terms of each contract "consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provision" of the UCC. This conclusion begs the question: Can a party utilize section 2–207(2) to provide additional terms to a contract formed pursuant to section 2–207(3)? Stated differently, can OxyChem use subsection (2) to incorporate the terms printed on the reverse side of its invoice into the contracts formed with ETP? [6] For the reasons stated below, the Court answers this question in the negative.

**2. Invoice Terms**

■ In *C. Itoh & Co. v. Jordan Int'l Co.*, 552 F.2d 1228, 1236 (7th Cir.1977), the

---

**6.** The Court notes both parties failed to address this precise issue in their briefs.

Seventh Circuit asked the following question: "What are the terms of a contract created by conduct under Section 2–207(3) rather than by an exchange of forms under Section 2–207(1)?" The appellate court explained:

> The second sentence of Section 2–207(3) provides that where, as here, a contract has been consummated by the conduct of the parties, "the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act." . . . .

We have been unable to find any case authority shedding light on the question of what constitutes "supplementary terms" within the meaning of Section 2–207(3) and the Official Comments to Section 2–207 provide no guidance in this regard. We are persuaded, however, that the disputed additional terms (*i.e.*, those terms on which the writings of the parties do not agree) which are necessarily excluded from a Subsection (3) contract by the language, "terms on which the writings of the parties agree," cannot be brought back into the contract under the guise of "supplementary terms." This conclusion has substantial support among the commentators who have addressed themselves to the issue. As two noted authorities on Article Two of the Code have stated:

> It will usually happen that an offeree-seller who returns an acknowledgment form will also concurrently or shortly thereafter ship the goods. If the responsive document (sent by the seller) contains a printed assent clause, and the goods are shipped and accepted, Subsection (3) of Section 2–207 comes into play. . . . [T]he terms on which the exchanged communications do not agree drop out of the transaction, and reference to the Code is made to supply necessary

terms. . . . Rather than choosing the terms of one party over those of the other . . . it compels supplying missing terms by reference to the Code. . . .

Duesenberg & King, *supra*, § 3.06[4] at 73–74. Similarly, Professors White and Summers have concluded that "contract formation under subsection (3) gives neither party the relevant terms of his document, but fills out the contract with the standardized provisions of Article Two." White & Summers, *supra*, at 29.

Accordingly, we find that the "supplementary terms" contemplated by Section 2–207(3) are limited to those supplied by the standardized "gap-filler" provisions of Article Two . . . . .

We are convinced that this conclusion does not result in any unfair prejudice to a seller who elects to insert in his standard sales acknowledgement form the statement that acceptance is expressly conditional on buyer's assent to additional terms contained therein. Such a seller obtains a substantial benefit under Section 2–207(1) through the inclusion of an "expressly conditional" clause. If he decides after the exchange of forms that the particular transaction is not in his best interest, Subsection (1) permits him to walk away from the transaction without incurring any liability so long as the buyer has not in the interim expressly assented to the additional terms. Moreover, whether or not a seller will be disadvantaged under Subsection (3) as a consequence of inserting an "expressly conditional" clause in his standard form is within his control. If the seller in fact does not intend to close a particular deal unless the additional terms are assented to, he can protect himself by not delivering the goods until such assent is forthcoming. If the seller does intend to close a deal irrespective of whether or not the buyer assents to the additional terms, he can hardly complain when the

contract formed under Subsection (3) as a result of the parties' conduct is held not to include those terms. Although a seller who employs such an "expressly conditional" clause in his acknowledgement form would undoubtedly appreciate the dual advantage of not being bound to a contract under Subsection (1) if he elects not to perform and of having his additional terms imposed on the buyer under Subsection (3) in the event that performance is in his best interest, we do not believe such a result is contemplated by Section 2–207. Rather, while a seller may take advantage of an "expressly conditional" clause under Subsection (1) when he elects not to perform, he must accept the potential risk under Subsection (3) of not getting his additional terms when he elects to proceed with performance without first obtaining buyer's assent to those terms. Since the seller injected ambiguity into the transaction by inserting the "expressly conditional" clause in his form, he, and not the buyer, should bear the consequence of that ambiguity under Subsection (3).

*Itoh*, 552 F.2d at 1236–37 (footnotes and citations omitted) (second, third, fourth, fifth, and sixth alterations in original). Thus, the court held that "supplementary terms," within the meaning of section 2–207(3), are limited to the standard gap-filler provisions of the UCC.[7]

In 1992, the Seventh Circuit expanded its holding in *Itoh* and determined that section 2–207(3)'s reference to "any other provision" encompasses those sections relating to course of performance (N.Y. U.C.C. Law § 2–208) and course of dealing and usage of trade (N.Y. U.C.C. Law § 1–205). *See Dresser Indus., Inc., Waukesha Engine Div. v. Gradall Co.*, 965 F.2d 1442,

1451–52 (7th Cir.1992); *see also Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1579 (10th Cir.1984). New York law follows the sound logic articulated in *Itoh, Dresser,* and *Daitom. See Lorbrook Corp. v. G & T Indus., Inc.*, 162 A.D.2d 69, 562 N.Y.S.2d 978, 981 (N.Y.App.Div.1990) (explaining how section 2–207(3) rejects the common-law last-shot rule "by giving neither party the terms it attempted to impose unilaterally on the other"); *see also Wyandotte Indus. v. E.Y. Neill & Co. (In re First Hartford Corp.)*, 63 B.R. 479, 489 (Bankr.S.D.N.Y.1986). Recently, the Supreme Judicial Court of Massachusetts declared:

> [T]he criteria in subsection (2) determine what "additional or different terms" will or will not be part of a contract that is formed by the exchange of writings. Where the writings do not form a contract, subsection (3) states its own criteria—"those terms on which the writings agree" plus any terms that would be provided by other Code sections. One cannot turn to subsection (2) as another Code section that would supply a term when, by its express provisions, subsection (2) simply does not apply to the transaction.

*Commerce & Indus. Ins. Co. v. Bayer Corp.*, 433 Mass. 388, 742 N.E.2d 567, 573–74 (2001); *cf. McCarty v. Verson Allsteel Press Co.*, 89 Ill.App.3d 498, 44 Ill.Dec. 570, 411 N.E.2d 936, 945 (1980) (stating "[i]t is well established that under this provision terms contained only in one of the party's forms are not part of the contract"). *But see JOM*, 193 F.3d at 54 (stating "[t]he terms of their agreement would then be determined under the 'default' test in § 2–207(3), which implicitly incorporates the criteria prescribed in § 2–207(2)").

---

7. The standard gap-filler provisions generally consist of sections 2–301 to 2–319. As an aside, the Court notes that the *Itoh* decision was based on an interpretation of New York's version of section 2–207(3).

■ Based on the foregoing authority, subsection (2) only becomes operative when a contract is formed under subsection (1). *See also, e.g., Dorton,* 453 F.2d at 1166. Therefore, the Court holds that a party cannot utilize section 2–207(2) to provide additional terms once a contract is formed pursuant to section 2–207(3). When a contract is formed pursuant to section 2–207(3), as here, the contract terms consist of the standard gap-filler provisions of the UCC as well as those sections relating to course of performance and course of dealing and usage of trade.

■ As stated in this Court's previous order denying ETP's motion for summary judgment, the record before the Court contains too many facts in dispute to resolve this matter on summary judgment. Because the Court has determined that the parties did not form a contract based on the exchange of their written documents, issues of fact as to the contract terms remain. A fact finder must decide what terms govern the parties' agreements by examining the parties' course of performance and course of dealing and usage of trade, and by applying the standard gap-

filler provisions of the UCC. *See* N.Y. U.C.C. Law §§ 1–205, 2–208, 2–301 to – 319. Issues of fact also remain with regard to when ETP received OxyChem's invoices. If OxyChem's invoice arrived after the goods arrived, then section 2–207 does not control. Case law suggests section 2–206(1)(b) forms the contract in accord with ETP's terms, as well as the standard UCC gap-filler provisions. *See, e.g., Wheaton Glass Co. v. Pharmex, Inc.,* 548 F.Supp. 1242, 1244–45 (D.N.J.1982); *G.W. White & Son, Inc. v. Gosier,* 219 A.D.2d 866, 632 N.Y.S.2d 910, 912 (1995) (noting that "a disclaimer or exclusion of warranties delivered to the buyer after consummation of the sale is not effective unless the parties have entered into a separate agreement pursuant to … § 2–209"); *Niagara Real Estate, Inc. v. Wollstein,* 198 A.D.2d 913, 604 N.Y.S.2d 464, 464 (1993) (stating the "terms are not binding upon the purchaser because the invoice was not sent within a reasonable time within the meaning of UCC 2–207(1)" and citing *Wiencken v. Mill–Rite Sash Door Co. (In re Empire Pac. Indus., Inc.),* 71 B.R. 500 (Bankr.D.Or.1987)); [8] *cf. First Sec. Mortgage Co. v. Goldmark Plas-*

---

**8.** In *In re Empire,* the bankruptcy court concluded that invoices sent by a seller were not "written confirmations" within the meaning of Oregon Revised Statute 72.2070 (the uniform counterpart of section 2–207 of the UCC) because the seller did not send the invoices within a reasonable time after the parties made their contracts. *See* 71 B.R. at 503. Prior to sending its invoices, the seller sent the buyer a written confirmation in the form of a copy of its production order. *See id.* The bankruptcy court determined that this was "the reasonable time to include proposals for additional terms to the oral contract." *Id.* The court explained:

> Sending such a proposal with the goods or after the goods were sent, as they were in this case, is not within a reasonable time of the making of the oral agreement. At the time the invoice was sent, the [seller] had completely performed its obligations under

the contract by sending the goods. To allow the seller to make proposals for additions to a contract it has already completely performed would work an injustice on the buyer, who in this case had accepted the goods on the basis of the terms agreed to orally. While the Uniform Commercial Code places upon buyers an obligation to inspect goods prior to accepting them, and will deem that they have been accepted if objection is not timely made, [2–606], it nowhere places an obligation upon the buyer to inspect the invoice which accompanies the goods at the risk of being deemed to accept any terms on the invoice to which it does not object. Thus, the terms on the reverse side of the invoices are not part of the contracts between these two parties. The contracts contain the terms which were agreed to orally, plus whatever provisions of the UCC that are necessary to fill any gaps in the agreement.

tics Compounds, Inc., 862 F.Supp. 918, 934 (E.D.N.Y.1994) (finding that a seller failed to prove the buyer "ever received or even saw the reverse side of the bills of lading or the relevant language in the invoices at issue" and concluding the buyer "could not be bound by such provisions"); WHITE & SUMMERS § 1–5 (stating "where the buyer sends a purchase order, the seller then ships the goods, and thereafter sends a form that arrives after the goods arrive, 2–207 does not control").

### 3. Economic Loss Rule, Material Representation, Justifiable Reliance, and ETP's Negligence

Finally, the Court would like to briefly address OxyChem's third, fourth, and fifth arguments in support of its motion for summary judgment. To the extent ETP's indemnification claim is based on a negligent misrepresentation theory of recovery, this Court cannot say such a claim is barred by either Alabama's, Florida's, New Jersey's, or New York's economic loss rule. The current status of the record and the case prevents this Court from making such a determination at this time. In addition, the Florida Supreme Court has declined to extend the economic loss rule to certain claims based on negligent misrepresentation.[9] *See PK Ventures,*

*Inc. v. Raymond James & Assocs., Inc.,* 690 So.2d 1296, 1296–97 (Fla.1997).

OxyChem's fourth argument in support of its motion for summary judgment is without merit. Whether a representation is material and whether a party reasonably relied upon a representation are typically questions of fact. *See Baker v. United Servs. Auto. Ass'n,* 661 So.2d 128, 132 (Fla. 1st DCA 1995). When the facts of this case are viewed in a light most favorable to ETP, this Court cannot say OxyChem's representations were not material. Nor can the Court find ETP did not have a right to rely upon the representations. Likewise, OxyChem's fifth argument fails because ETP's negligence has not been established. Therefore, summary judgment is premature. *See Dade County Sch. Bd. v. Radio Station WQBA,* 731 So.2d 638, 643–44 (Fla.1999); *Rea v. Barton Protective Servs., Inc.,* 660 So.2d 772, 773–74 (Fla. 4th DCA 1995). For the reasons stated above, OxyChem's motion for summary judgment is DENIED.

### III. SUMMARY

The Court's ruling in this matter may be summarized as follows, and IT IS HEREBY ORDERED:

1. Third–Party Defendant OCCIDENTAL CHEMICAL CORPORA-

---

*Id.* As an aside, the Court notes that *Wollstein* has never been cited to in another legal opinion and *In re Empire* has only been cited to two other times. At best, *Wollstein* and *In re Empire* stand for the proposition that a court can conclude the terms of an invoice are not binding because the invoice was not sent within a reasonable time as required by section 2–207(1). This conclusion, in turn, is based upon an application of the facts under section 1–204(2). That section states "a reasonable time for taking any action depends on the nature, purpose and circumstances of such action." N.Y. U.C.C. LAW § 1–204(2); *see also First Sec. Mortgage Co. v. Goldmark Plastics Compounds, Inc.,* 862 F.Supp. 918, 933 (E.D.N.Y.1994) (stating "[a] reasonable

time depends upon the circumstances of each case and the term is to be treated flexibly").

9. However, the supreme court has also held that the economic loss rule should be limited to cases involving policy considerations similar to those in the product liability context. *See Moransais v. Heathman,* 744 So.2d 973, 979–83 (Fla.1999). For a discussion on the policy reasons used to apply the economic loss rule to product liability cases, see *Moorman Mfg. Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443, 444–54 (1982) and *Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, 148–52 (1965).

TION's motion for summary judgment (doc. 144) is **DENIED**.

2. The issues are joined in this case and the discovery period has ended. The trial in this case will now be set. Toward this end, counsel are directed to confer personally and notify the Court in writing within five (5) working days of the expected length of the trial and confirm this case to be a trial by judge or jury. All parties will be notified by separate order of the dates for the pretrial conference, if necessary, and trial.

## APPENDIX

## I. STATEMENT OF THE CASE

### A. Background

For purposes of ruling on Defendant's motion for summary judgment, the following facts are viewed in a light most favorable to the Plaintiff.[1] In 1996, Dr. John C. Hovanesian, along with his brother Archibald Hovanesian (hereinafter collectively referred to as the "Hovanesians"), created Coastal & Native Plant Specialties, Inc. (hereinafter "Plaintiff" or "Coastal") (doc. 60 ¶ 6). Coastal is a for-profit corporation located in Milton, Florida, and specializes in the construction, reconstruction, and re-vegetation of sand dunes. Coastal's main source of income is generated from selling hydroponically grown sea oats (*Id.* ¶ 3).[2] In fact, its complex is composed of a hydroponic production facility that contains ten commercial-sized greenhouses.

At the same time Coastal came into existence, the Hovanesians also created Agricultural Innovations & Research, Inc. ("AIR"). AIR is a not-for-profit research foundation primarily responsible for developing horticulturally-based products and processes from new and emerging technologies, including hydroponically grown vegetation (*Id.* ¶ 5). AIR operates as the research and development arm of Coastal.[3] In practice, AIR performs research and acquires grant money from agencies that fund innovative projects that advance the quality of life. If AIR receives a grant, the Hovanesians use the money to pay for expenses associated with the project. Coastal thereafter generates income by implementing the technologies that are developed, growing the vegetation, and then selling the final product (*Id.* ¶ 3). The Hovanesians are the principal officers of AIR and Coastal, (*Id.* ¶ 6), and both entities maintain the same office space and staff. The main complex is located on land owned by Dr. Hovanesian, who in turn has leased it to AIR, who then subleased it to Coastal.

Since 1993, the Hovanesians have been soliciting grants from John Harper ("Harper"), the project coordinator for Three Rivers Resource Conservation & Development Council, Inc. ("Three Rivers") (*Id.* ¶ 8). Three Rivers is a public-private 501(c)(3) not-for-profit corporation associated with the United States Department of Agriculture (doc. 60 ¶ 7).[4] It works as part of, and in conjunction with, the State of Florida in grant oversight and adminis-

---

1. Furthermore, as discussed in Part II.A., *infra*, some of the facts are construed according to Local Rule 56.1(A). If the Court cites Defendant's statement of material facts as to which there is no genuine issue, (doc. 60), then that fact has been deemed admitted for the limited purpose of ruling on Defendant's motion for summary judgment.

2. Sea oats is a tall grass with "panicles resembling those of the oat." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1058 (1991). It grows on the southern coast of the United

States and "is useful as a sand binder." *Id.* Coastal offers a full range of services associated with its sand dune operations. For example, when a beach erodes, Coastal begins by preparing the site and planting the sea oats. Coastal then monitors the site to protect the seedlings. Once the sea oats start to grow, the sand dunes slowly begin to return.

3. Coastal operates as the commercial and production arm.

4. Three Rivers, like Coastal and AIR, is located in Milton, Florida.

tration. Three Rivers's mission is to conserve natural resources and to improve the overall economic condition of rural and urban Americans. It strives to better Florida's economic, environmental, and social needs by providing technological information and grant money to innovative and sound projects that have the potential to improve the quality of life while at the same time becoming commercially feasible (*Id.* ¶ 9). Three Rivers accomplishes its work by managing grants funded by the State of Florida and other public sources. In theory, Three Rivers acts as the "contractor" and develops the project that is the subject of the grant. However, in practice, the "principal"—the entity responsible for developing the project—undertakes the grant. Three Rivers merely administers and supervises the grant through record-keeping, auditing, and periodic progress reports. The grants are awarded on a reimbursement-after-expenses basis. This ensures the integrity of the project. Any expense not within the scope of the project is disallowed. The principal who develops the project retains ownership to all property—tangible and intangible—acquired or developed under the grant. Three Rivers does not claim any type of ownership.

Over the years, Three Rivers has extended the Hovanesians, through AIR (*Id.* ¶ 10), more than $300,000 in grant money to fund some of their projects. The money came from the Florida Energy Office, a division of Florida's Department of Community Affairs (*Id.*). These grants were in part used to construct and modify greenhouses and to hydroponically grow crops, such as onions (*Id.* ¶ 11). In order to receive the grant money, the Hovanesians would first have to incur an expense that was within the scope of one of their projects. Three Rivers would then reimburse the Hovanesians for any qualifying expense. However, Three Rivers did not always follow its reimbursement-after-expenses procedure. Occasionally, Three Rivers would provide its own money up front. In essence, the principal would call a vendor and place an order. Three Rivers would then pay for it and be reimbursed when the grant money later became available from the Florida Energy Office. This occurred during Three Rivers's relationship with the Hovanesians.

In 1994, the Hovanesians contacted Harper and asked him whether he knew of anyone who sold containment liners (*Id.* ¶ 14). These liners were needed to cover the interior walls of hydroponic tanks located within Coastal's greenhouses. Harper recommended Engineered Textile Products, Inc. (hereinafter "Defendant" or "ETP"), an Alabama corporation whom he had previously conducted business with in his capacity as Three Rivers's project coordinator (doc. 60 ¶¶ 13–14).[5] As a result of this recommendation, Dr. John Hovanesian purchased two polypropylene ("PPE") tank liners from ETP (*Id.* ¶ 12). These liners were placed inside tanks that were being used to hydroponically grow sea oats and onions under controlled testing conditions. Almost three years later, the Hovanesians needed more liners and again desired to do business with ETP. Dr. Hovanesian contacted Carter Damp ("Damp"), ETP's containment-liner salesman (*Id.* ¶ 2). He explained to Damp the particular purpose for which the liners were to be used—*i.e.*, to cover the interior walls of specifically designed tanks that

---

5. ETP fabricates and distributes a variety of containment liners for such applications as brine storage ponds, canal linings, cap and liners for solid waste landfills, decorative ponds, fish rearing ponds, fly ash pads, heap leach pads, irrigation water storage, mine tailings, oil reserve pits, recreational lakes, reservoirs, sanitary landfills, secondary containment, sewage aeration ponds, sewage settling lagoons, and waste water treatment plants (doc. 60 ¶ 1).

were going to be used to hydroponically grow sea oats and onions (*Id.* ¶ 16). Damp even toured Coastal's facilities and viewed the hydroponic tanks that were going to utilize the liners. Sometime during their discussions, Damp informed Dr. Hovanesian about a cheaper alternative to the PPE liners previously purchased from ETP. He claimed that 30 mil fish grade polyvinyl chloride ("PVC") liners could be used for the same purpose as the PPE liners, and that there was no difference between the two except for a shorter life expectancy. However, prior to selling the liners, Damp decided to contact Occidental Chemical Corporation ("OxyChem").[6] He asked David Lauwers, OxyChem's "Film & Compound" manager, whether PVC could be used with, or contain, hydroponic solution. Lauwers thought that it would work for that application and responded in the affirmative. Based on this information, Damp recommended the PVC liners. Consequently, Dr. Hovanesian decided to purchase a total of ten PVC liners from ETP over a four-month period. These liners were ordered and sold in four batches: four liners were sold in the first batch, and two liners were sold in each of the three remaining batches. All of the invoices prepared by ETP indicate that the

liners were "sold to" Three Rivers (doc. 60 ¶¶ 17, 24, 29, 34).[7]

After the PVC liners began to arrive at Coastal's main complex, problems soon developed. For example, some of the liners did not fit the hydroponic tanks properly and had to be re-fabricated. Weeks later, the onion crop had to be discarded because the plants appeared to be degrading and grew at a much slower rate than expected. Dr. Hovanesian attempted to grow a second crop, but this too failed. Not knowing what was causing the problem, Dr. Hovanesian contacted ETP, who in turn put him in contact with OxyChem. After conducting a series of tests, OxyChem concluded that there was some loss of the plasticizer contained within the PVC geomembrane.[8] However, OxyChem did not test whether the onions absorbed any of the plasticizers. Based on these results, Dr. Hovanesian discontinued growing the onions at that time. To compound matters further, the PVC liners began to shrink. After being notified of the shrinkage problem, ETP sent a crew to Coastal's main complex and they instructed Dr. Hovanesian on how to repair and refit the liners. Unfortunately, this did not solve the problem and the shrinkage continued. As a result, the PVC liners had to be replaced.

---

6. OxyChem is a New York corporation with its principle place of business in Dallas, Texas. It manufactures the material used to fabricate PVC liners.

7. While this fact is clearly shown within the record, the Court has been unable to determine with legal certainty, based on the evidence before it, (1) from whom or from what entity the consideration used to purchase the PVC liners moved from or belonged to; (2) in what capacity the parties, as well as the other entities, dealt with each other; and (3) what type of understanding existed between the parties. Therefore, the Court cannot say that Coastal is not in privity of contract with ETP. *See generally* 17A Am. Jur. 2D *Contracts* § 425 (1991) (discussing who may enforce a contract and stating: "Privity may be implied by

law between the promisor and the person to whom the consideration belongs, even though the latter is not a party to the contract. An action for breach of contract brought by the person from whom the consideration moved and who is a beneficiary has been sustained on various theories. There is authority that if the contract does not state in express terms to whom the promise is made, the law declares that it is made to the person from whom proceeded the consideration by which it is supported.") (footnotes omitted).

8. PVC geomembrane, the material used by ETP to fabricate the liners, contains a linear phthalate plasticizer (doc. 60 ¶ 46). This plasticizer is soluble in water at a range of parts per million (*Id.*).

### B. Procedural History

Plaintiff, Coastal & Native Plant Specialties, Inc., originally filed this contract action in state court, alleging breach of an implied warranty of fitness for a particular purpose (doc. 1, Exh. D).[9] Defendant, Engineered Textile Products, Inc., filed a notice of removal pursuant to 28 U.S.C. § 1446(a), and this Court accepted jurisdiction (doc. 1). Defendant also filed an amended third-party complaint against OxyChem, seeking indemnification for any damages suffered as a result of Plaintiff's cause of action (doc. 50). After a lengthy discovery period, Defendant filed a motion for summary judgment and documents in support thereof (docs. 58, 60–61). The Court took summary judgment under advisement (doc. 62) and Plaintiff thereafter filed a memorandum and evidentiary materials in opposition (doc. 68).

---

9. When parties enter into a contract that involves the sale of goods, an implied warranty of fitness for a particular purpose can arise "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and ... the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." FLA. STAT. ANN. § 672.315 (West 1993).